UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO
ALBUQUERQUE DIVISION


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO: 1:14-MJ-00435-ACT |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | Albuquerque, New Mexico |
| | ) | |
| FELIPPE JONES, | ) | Friday, February 14, 2014 |
| | ) | |
| Defendant. | ) | (9:43 a.m. to 10:20 a.m.) |


PRELIMINARY EXAMINATION / DETENTION HEARING

BEFORE THE HONORABLE ALAN C. TORGERSON,
UNITED STATES MAGISTRATE JUDGE


<u>APPEARANCES</u>:

For Plaintiff:              ELAINE Y. RAMIREZ, ESQ.
                            U.S. Attorney's Office
                            District of New Mexico
                            P.O. Box 607
                            Albuquerque, NM 87103

For Defendant:              JOHN VAN BUTCHER, ESQ.
                            Office of the Federal Public Defender
                            First State Bank Building
                            111 Lomas Boulevard NW
                            Suite 501
                            Albuquerque, NM 87102

Court Reporter:             Recorded; Liberty (ABQ-Gila)

Clerk:                      E. Romero

Transcribed by:             Exceptional Reporting Services, Inc.
                            P.O. Box 18668
                            Corpus Christi, TX 78480-8668
                            361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

INDEX

| GOVERNMENT'S WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| DEAN GOLDTOOTH | 4 | 15 | | |

RULING RE PROBABLE CAUSE      26

ARGUMENT

BY MR. BUTLER      27 / 29

BY MS. RAMIREZ      29

RULING RE DETENTION      30

1    <u>Albuquerque, New Mexico; Friday, February 14, 2014; 9:43 a.m.</u>

2                            <u>Call to Order</u>

3          **THE CLERK:**  The Court calls the *United States versus*

4    *Felippe Jones.*

5          **MS. RAMIREZ:**  Elaine Ramirez --

6          **MR. BUTCHER:**  John Butcher, your Honor --

7          **THE COURT:**  I'm sorry?

8          **MR. BUTCHER:**  (indiscernible) hearing so --

9          **THE COURT:**  All right.  Are you ready, Ms. Ramirez?

10         **MS. RAMIREZ:**  I am ready, your Honor.

11         **THE COURT:**  All right.  For the first time in 11

12   years I didn't hear you, Mr. Butcher.

13         **MR. BUTCHER:**  So sorry -- I'll try to speak up.

14         **THE COURT:**  All right, let's do.

15         **MS. RAMIREZ:**  The United States would call Dean

16   Goldtooth to the stand.

17         **THE CLERK:**  Please raise your right hand.

18         **DEAN GOLDTOOTH, GOVERNMENT'S WITNESS, SWORN**

19         **THE WITNESS:**  Yes, I do.

20         **THE CLERK:**  Thank you.  Please be seated and state

21   and spell your name for the record.

22         **THE WITNESS:**  My name is Dean Goldtooth, first name

23   spelling is D-E-A-N, last name spelling is G-O-L-D-T-O-O-T-H.

24         **MS. RAMIREZ:**  May it please the Court?

25         **THE COURT:**  You may proceed.

1                        **DIRECT EXAMINATION**

2    **BY MS. RAMIREZ:**

3    Q    Sir, where are you employed?

4    A    I'm employed with the Navajo Police Department.

5    Q    All right.  And how long have you been employed with the

6    Navajo Police Department?

7    A    Approximately 14 years.

8    Q    And as part of your employment did you attend any

9    particular types of training?

10   A    Yes, I actually attended a lot of training.  We have to

11   maintain our 40 hours of training every year.

12   Q    All right.  But let's start initially, did you attend a --

13   for example, an academy?

14   A    Yes, we -- I attended the Navajo Law Enforcement Training

15   Academy in Toyei, Arizona.

16   Q    All right.  And then subsequent to that you have a

17   certification that you have to maintain?

18   A    Yes.  I also went to the Federal Law Enforcement Training

19   Academy, the Criminal Investigator Training Program.

20   Q    All right.  So you went to the first academy, you went to

21   this -- the Criminal Investigators Training Academy?

22   A    Yes.

23   Q    And in between those academies you also maintained your

24   certification.  And what does that entail?  What do you have to

25   do to maintain that certification?

1  A    We've got to attend 40 hours of training per year.  It can

2  be anything from traffic stops to drug investigations to just a

3  wide variety of police duties.

4  Q    Okay.  And what is your current assignment with the Navajo

5  Nation?

6  A    For the last seven years I've been assigned to the Navajo

7  Nation Drug and Gang Unit.

8  Q    All right.  And does your assignment require any specific

9  training?

10 A    Yes, it does.

11 Q    Okay, and does that include recognition of patterns of

12 narcotics trafficking conduct?

13 A    Yes, it does.

14 Q    Okay.  Let's talk about what happened on December 30th,

15 2013.  Can you tell the Court basically what occurred with

16 Officer Johnson?

17 A    Yes.  On December 30th Officer Albina Johnson (phonetic)

18 did -- or she responded to a call for police services to a

19 house burglary.

20 Q    All right.  And where did that occur at?

21 A    In Shiprock, New Mexico.

22 Q    All right.  And is that on the Navajo Nation?

23 A    Yes, it is.

24 Q    All right.  And what items were taken from the residence?

25 A    The items listed on her police report was one Rock River

1   Island Armory 10 mm pistol, a 357 pistol, but the owner did not

2   know the make, model, serial number; also an electric guitar,

3   same thing, he didn't know the make, model, serial number and a

4   DVD player with the same thing, no make, model or serial number

5   on that and --

6   Q    All right.  And was there also some jewelry?

7   A    And some jewelry taken, but the owner of that one did not

8   know what type.

9   Q    Okay.  And as a result of this call out, was any

10  information entered into NCIC?

11  A    Yes.

12  Q    All right.  What information was that?

13  A    The Rock River Island Armory hand gun.  That one actually

14  did have a serial number with it.

15  Q    Okay.  Let's move onto February 2nd.  What happened of

16  significance to this case on that date?

17  A    On February 2nd, New Mexico State Police Officer Brian

18  Hobbs contacted Albina Johnson and informed her that a Brian

19  Binali (phonetic) had given him a VIN or a serial number on a

20  hand gun to get checked through NCIC, I guess he was trying to

21  get the hand gun registered.

22        When Officer Hobbs ran the serial number he found

23  that the gun came back as stolen through NCIC, and we were --

24  the Navajo Police Department was the originating office.

25  Q    Okay.  And as a result of that conversation between

1  Officer Hill and Officer Johnson, were you contacted?

2  A    Yes.

3  Q    All right.  And what did you do as a result of that

4  contact?

5  A    I was informed by Officer Hill, he's also the other person

6  that I work with in the Shiprock office of the Navajo Drug and

7  Gang Unit, so he informed me and we went out and talked with

8  Albina Johnson and got Mr. Binali's contact number and we

9  contacted him.

10 Q    All right.  And so you both made contact with him?

11 A    Yes, we did.

12 Q    All right.  And what did you discuss with him?

13 A    We discussed with him where he got the serial number from

14 and how he got it, and he did describe that he did see the hand

15 gun over at his cousin's house, Felippe Jones.

16 Q    All right.  And what did he tell you about how he obtained

17 the serial number?

18 A    He said that it was still in a box and on the outside of

19 the box was a labeling -- looking -- telling you what the hand

20 gun is, the serial number and the make and model on there,

21 that's why he wrote that down.

22 Q    All right.  So if I understand you correctly, Mr. Binali's

23 -- was -- or observed this particular firearm at Mr. Jones's

24 residence?

25 A    Yes.

1  Q    All right.  And what was Mr. Binali and Mr. Jones, I don't

2  know, understanding of what was -- what was supposed to

3  transpire with gun?  Was it for sale, was it a gift, do you

4  know?

5  A    The -- well, from what we got from Mr. Binali he said that

6  Mr. Jones did offer to sell him the handgun for $200.

7  Q    Okay.  Did Mr. Binali indicate the source of the gun or

8  did he indicate how Mr. Jones came into possession of the gun?

9  A    He did question if that -- he did want to register the gun

10 and he asked Mr. Jones if the hand gun was stolen.

11 Q    And what was Mr. Jones's reply?

12 A    Mr. Jones replied, "I don't think so."

13 Q    All right.  And did they have any additional conversations

14 that you're aware of?

15 A    Not after the thing, but he -- I know Mr. Binali did

16 state, "Well, if you don't know then it probably is stolen,"

17 and at that time Mr. Jones stated that -- to Mr. Binali that he

18 did inherit the gun.

19 Q    He inherited it?

20 A    Yes.

21 Q    All right.  What did Mr. Binali say about the price of the

22 firearm?

23 A    He said he didn't have the money right then and then --

24 right then and there, so that's the reason why he didn't take

25 possession of the hand gun.

1  Q    All right.  Okay.  Was Mr. Binali able to give you any

2  information about where Mr. Jones lived?

3  A    Yes.  He gave us the residence of the BIA (phonetic)

4  Compound apartments off of Yucca Street.

5  Q    All right.  And is there a specific portion of the

6  residence that's basically only available to Mr. Jones?

7  A    Yes.  He said Mr. Jones does live in the garage.

8  Q    All right.  As a result of that conversation with

9  Mr. Binali, did Mr. Binali make any offers to assist law

10  enforcement?

11  A    Yes, he did.

12  Q    And what did he say?

13  A    He did offer to try to get the hand gun for us just -- to

14  get the hand gun or he did -- he was willing to purchase the

15  hand gun for us also.

16  Q    All right.  Was Mr. Binali successful in purchasing the

17  hand gun?

18  A    No.  Every time -- he said from that point when we made

19  contact with him, he stated that he never had contact with

20  Mr. Jones after that.

21  Q    All right.  And, ultimately, did Mr. Binali leave the

22  State?

23  A    Yes.

24  Q    All right.  But did you still have contact with him?

25  A    Yes, we had contact with him through his cell number.

1    Q    All right.  Let's talk -- move onto basically the events

2    of February the 4th through February 6th.  Did you participate

3    in those events?

4    A    Yes, I did.

5    Q    And what did you do?

6    A    We conducted surveillance on Mr. Jones's residence.

7    Q    All right.  And were -- as a result of that surveillance

8    were you able to actually put eyes on Mr. Jones?

9    A    Yes.  Every now and then he would come out of the garage

10   and go back into the garage.

11   Q    Okay.  And that individual that you saw coming in and out

12   of that garage, is he in the courtroom here today?

13   A    Yes, he is.

14   Q    All right.  Can you point him out and describe what he is

15   wearing?

16   A    He's the gentleman sitting to the left of his attorney,

17   wearing the red jumpsuit with the orange shoes.

18           **MS. RAMIREZ:**  Okay.  Let the record reflect

19   identification.

20           **THE COURT:**  The Court record will reflect that the

21   witness has identified the Defendant.

22           **MS. RAMIREZ:**  All right.

23   **BY MS. RAMIREZ:**

24   Q    So why were you conducting surveillance?

25   A    Based on the information that we received from Mr. Binali

1    about a stolen hand gun trying to be sold from his residence.

2    Q    And what did you observe during the surveillance periods?

3    A    While we were at the residence we did observe that there

4    was a lot of foot traffic and vehicle traffic where they would

5    come up to the house, go inside the garage, and then be in

6    there for a couple of minutes and then leave the area again.

7    Q    Okay, and what did that signify to you?

8    A    To myself and Officer Hill, we did -- the activity at the

9    house was consistent with someone that is possibly selling

10   narcotics out of the residence.

11   Q    All right, sir.  And is that based on your training,

12   education and experience?

13   A    Yes.

14   Q    All right.  Let's move onto to February 6th, then.  Did

15   you contact Mr. Binali?

16   A    Yes, we did.

17   Q    And where was he at?

18   A    He was still in Phoenix.

19   Q    All right.  And did you give him any instructions?

20   A    I informed him that it was very important for us to get

21   that stolen hand gun and if he was still willing to help, which

22   he agreed, so we asked him if he had contact with Mr. Jones and

23   he said he didn't.

24   Q    That he did not?

25   A    He did not, no.

1    Q    Okay.

2    A    He did not receive any answers to his text messages or

3    phone calls, so we informed him to just go ahead and text

4    message him again and let him know that we were -- that he was

5    going to send a friend to his house to buy the hand gun.

6    Q    Okay.  So you asked Mr. Binali to send a text -- an

7    additional text message to --

8    A    To Mr. Jones.

9    Q    -- Mr. Jones?

10   A    Yes.

11   Q    All right.  And that text message was basically to consist

12   of you were going to send -- that someone else was going to be

13   sent to purchase the --

14   A    Yes.

15   Q    Okay.  And did he do that, to the best of your knowledge?

16   A    Yes.  A couple hours later, yes, I called him back and he

17   did inform me that he did send a text.

18   Q    All right.  And as a result of all of that what happened

19   on February 6th?

20   A    On February 6th, after we got the phone call, we conducted

21   a (indiscernible) operation where we sent in two of our

22   undercover officers to the residence to attempt to purchase the

23   hand gun.

24   Q    All right.  And did -- was there surveillance present on

25   that date as well?

1   A     Yes, there was.

2   Q     Did the undercover officers actually enter the residence?

3   A     Yes, they did.

4   Q     All right.  And did you have a means of keeping in contact

5   with those two officers?

6   A     Yes.  We sent two undercover officers, the support officer

7   kept an open phone line with us.

8   Q     Okay, so like his cell phone was on at all times?

9   A     Yes.

10  Q     Okay.  And were -- so were you able to -- you or the

11  support agent able to actually hear the conversation that was

12  going on?

13  A     We -- we heard part of the conversation, but like five

14  minutes into it when they were entered into the residence or

15  the garage the phone line shut off on us, so after five minutes

16  we weren't able to hear.

17  Q     Okay.  Were the undercover agents outfitted with a

18  recording device?

19  A     Yes --

20  Q     All right.  And did that recording device remain intact

21  throughout the contact?

22  A     Yes, it did.  Yes.

23  Q     All right.  And were the undercover agents then able to

24  actually make the purchase of the firearm?

25  A     Yes, they did.

1  Q     All right.  Did they purchase anything else?

2  A     They also purchased another additional 22 revolver and 2.2

3  grams of meth.

4  Q     All right.  And the -- let me talk to you just a little

5  bit about what were the undercover agents outfitted with when

6  they entered the residence?  Did they -- for example, were they

7  given official Government funds?

8  A     Yes, they were -- they were given confidential

9  (indiscernible) to purchase the evidence.

10  Q     And do you remember the amount?

11  A     He was issued $405.

12  Q     All right.  And were they able to spend all $405 in that

13  garage?

14  A     Yes, they did.  Yes, they did.

15  Q     Following the purchases did they then leave the residence?

16  A     Yes, they did.

17  Q     And meet up with you and other agents?

18  A     Yes, they did.

19  Q     All right.  Was a field test conducted of the 2.2 grams of

20  methamphetamine?

21  A     Yes, it was.

22  Q     All right.  And how -- what was the result of that field

23  test?

24  A     It was -- tested positive for the percent of marijuana --

25  or methamphetamines, I'm sorry.

1   Q    Okay.  And after all of this occurred, at some point did

2   you then have an arrest warrant issued for Mr. Jones?

3   A    Yes.

4   Q    All right.  And did you and other agents then arrest him?

5   A    Yes, we did.

6   Q    Okay.

7           **MS. RAMIREZ:**  I'll pass the witness, your Honor.

8           **THE COURT:**  All right.  Mr. Butcher, you may cross

9   examine.

10          **MR. BUTCHER:**  Thank you, your Honor.

11                        **CROSS EXAMINATION**

12  **BY MR. BUTCHER:**

13  Q    This all started -- or the investigation of the case

14  started when Mr. Binali called, I guess, law enforcement to

15  register the firearm?

16  A    Not us, but the State Police, yes.

17  Q    Yes.  And so he actually told the officers that he had the

18  gun and wanted to register it?

19  A    Yes, and he wanted to check to see if it was stolen.

20  Q    Right.  And he had the information about the firearm at

21  that time?

22  A    Yes.

23  Q    Okay.  Now they told him that it came back stolen and

24  that's when he said he got it from Mr. Jones, right?

25  A    I'm sorry?

1  Q    All right.  What happened when -- was it Officer Johnson

2  that informed Mr. Binali that it was stolen?

3  A    When did she?

4  Q    No, what happened then?

5  A    I -- we didn't ask her.

6  Q    Okay.  Did Mr. Binali tell Officer Jones (sic) that he had

7  the gun?

8  A    Officer Jones?

9  Q    Or, I'm sorry, Officer Johnson or whoever with the State

10  Police, whoever he called to register it with?

11  A    Do you mean Officer Hobbs?

12  Q    Officer -- okay.

13  A    He -- he -- all he talked with Mr. Hobbs was about was to

14  run the VIN number to get it registered and to see if it was

15  stolen.

16  Q    Okay.  And how did he get a hold of that particular

17  Officer, was it some Hotline or was it a 9-1-1 call or --

18  A    No.  He actually tried calling the Shiprock Police

19  Department, but no officers were available to assist him so he

20  contacted Farmington, and then Farmington PD is the one that

21  actually transferred him to the State Police.

22  Q    Okay.  Now what is the relationship between Mr. Binali and

23  Mr. Jones?

24  A    They are cousins.

25  Q    Okay, so they are related by blood?

1  A    Yes, their mothers are sisters from what he told us.

2  Q    All right.  From -- who is "he," Mr. Binali or Mr. Jones?

3  A    I'm sorry?

4  Q    Who told you that, Mr. Binali or Mr. --

5  A    Mr. Binali.

6  Q    Okay.  So Mr. Binali knew Mr. Jones pretty well, correct?

7  A    Yes.

8  Q    Now, in fact they lived -- how far apart did they live

9  from each other?

10  A    I'd say probably it was about three miles maybe.

11  Q    Okay.  And Mr. Binali said something about Mr. Jones

12  saying the gun was inherited?

13  A    Yes.

14  Q    But Mr. Binali would know Mr. Jones's family, correct,

15  'cause they're family?

16  A    Yes.

17  Q    So -- okay.  And that didn't strike you as odd at all?

18  A    Well, it struck Mr. Binali as odd.

19  Q    Okay.  Now you started surveilling Mr. Jones's apartment

20  or garage, whatever it was, around February 4th?

21  A    Yes.

22  Q    Was it true 24/7 or did you watch it for a while and then

23  leave and come back?

24  A    Well, it was a good majority of it because it was -- it

25  was supposed to be 24 hours, but the first group that was there

1  they stayed till -- from 9:00 at night till 7:00 in the morning

2  when there was no -- there was no activity, so they stopped for

3  two hours, and then the next guy came in at 9:00 o'clock in the

4  morning and then it started from there all the way until 9:00

5  until the next people came.

6  Q    All right.  So when you said people were coming up to the

7  residence it was during the day, not at night?  It was not from

8  the 9:00 p.m. to 7:00 a.m. part?

9  A    It was both day and night.  There was people coming in

10 throughout the day and then in the evening time, nighttime

11 also.

12 Q    All right.  Now you said that the people that were there

13 from the 9:00 to 7:00 didn't see anything?

14 A    I didn't say that.

15 Q    Okay, so how late was the -- when was -- okay, at what

16 time during the night did people come by and how long did they

17 stay?

18 A    It was -- I mean, people would come throughout the day.  I

19 mean, the first team from 9:00 in the morning till 9:00 in the

20 evening would observe people going into the house, and then the

21 people that were from 9:00 at night till 9:00 in the morning

22 would also observe the same activity.

23 Q    They were able to observe it at 1:00 or 2:00 in the

24 morning?

25 A    Yes.

1   Q    Okay.  And was there a log kept about how often when

2   people were there?

3   A    I would probably say about five to 10 minutes they would

4   stay at the residence and then leave again.

5   Q    Were these the same people or different people?

6   A    Different people.

7   Q    Okay.  Were they carrying -- all right, how many -- how

8   much traffic in that 24 hour period, how many people in that 24

9   hour period did go there?

10  A    I'd probably say more than 10 to 12 people -- or 10 to 12

11  times activity would come.  It was usually -- sometimes it

12  would be two people or one person, stuff like that.

13  Q    So there was 12 visits --

14  A    Yes.

15  Q    -- in a 24 hour period?

16  A    About.  I'm not saying it's exactly 12.

17  Q    Well, okay, about.  And how many of those visits were

18  after 9:00 p.m.?

19  A    Oh, probably about half of them at least.

20  Q    So there was six visits after 9:00 p.m. and six visits

21  during the day?

22  A    About, depending because each day was different.

23  Q    All right.  Were the people -- did you write up license

24  numbers or --

25  A    We tried to, but at the angle that we were at we weren't

1  able to get some license plate numbers and stuff.

2  Q    Did you talk to Mr. Binali about Mr. Jones's occupation?

3  A    Yes.

4  Q    What did he say?

5  A    He told us that he was unemployed.

6  Q    Then how did he make a living?

7  A    I guess he -- from his mother because he stayed there.

8  Q    All right.  Did they mention to you that he works on

9  electronics?

10  A    He didn't mention that.

11  Q    Okay.  Now the two officers went into -- I believe on

12  February 6th went into Mr. Jones's home?  You said two

13  undercover officers at some point went into Mr. Jones's home?

14  A    Yes.  Not in his home, but the garage, yeah.

15  Q    Well, where was he living?

16  A    In the garage.

17  Q    So the garage was his home?

18  A    Yes, that's where he stayed so, yeah.

19  Q    All right.  Well, I don't mean to put words in your mouth.

20        Okay, where was Mr. Jones staying during the time

21  period that you were observing him?

22  A    In the garage.

23  Q    Okay, and so -- but that is not his home?

24  A    Well, yeah, I would say it would be his home because his

25  mom lives in the house while he stays in the garage.

1  Q    Okay.  Where would he sleep?

2  A    In the garage.

3  Q    All right.  When your officers went in there, was there a

4  bed in the garage?

5  A    Yes, there was a bed observed.

6  Q    Okay.  What else was observed in the garage?

7  A    There was also a monitor that was observed with -- that

8  was split in fours so where they could see the footage from the

9  outside cameras.

10  Q    And was there also electronics in the garage?

11  A    Yes.

12  Q    What kind of electronics were in the garage?

13  A    Laptops, they did observe computers --

14  Q    And computer parts were also in the garage?

15  A    Yes.

16  Q    Now did he observe -- well, actually I'll get to that in a

17  minute.

18        Who initially suggested the purchase in the garage,

19  the undercover officers or Mr. Jones?

20  A    The officers.

21  Q    So the officers -- what did the officers say to Mr. Jones?

22  A    Well, the officers initially asked for marijuana or Bud,

23  they said "Bud," a term to describe marijuana.

24  Q    Okay.  Why did the officers ask Mr. Jones whether he would

25  sell marijuana to them?

 1   A     Because of the activity that we did observe.

 2   Q     But Mr. Jones had not, before that point, had mentioned

 3   that he was selling any drugs or had any drugs, did he?

 4   A     Mr. Jones?

 5   Q     Yes.

 6   A     We didn't talk to Mr. Jones before that.

 7   Q     Right.  But I'm saying, when the officers came to talk

 8   about the guns, Mr. Jones did not offer to sell the officers

 9   any kind of drugs, did he?

10   A     No.

11   Q     Okay.  So the officers asked if he had any Bud?

12   A     Yes.

13   Q     What was the exact words that they asked?

14   A     "Do you have any Bud?"

15   Q     All right.  And what did -- what did Mr. Jones say?

16   A     He stated that he didn't and that he was looking for some.

17   Q     So Mr. Jones said that he wanted some marijuana, too?

18   A     Yes.

19   Q     All right.  What happened then?

20   A     Then he asked him if he had any Yayo.

21   Q     Who -- who?

22   A     The undercover officer asked if he had any Yayo.

23   Q     What's Yayo?

24   A     It's a term to describe cocaine.

25   Q     Okay, and what did Mr. Jones reply?

1  A    He stated that he didn't have any, but he had the other

2  stuff.

3  Q    Okay.  What happened -- what was said next?

4  A    Well, I believe the term that the officer heard was "I

5  don't have any, but I have the other stuff, G."

6  Q    Okay, what does cheese represent?

7  A    Not cheese, G, the letter G.

8  Q    Oh, G.

9  A    Yes.

10  Q    What does G represent?

11  A    It's a term to describe methamphetamines.

12  Q    Okay.  What happened then?

13  A    They talked about purchasing the methamphetamines.

14  Q    And did Mr. Jones state that was his personal supply of

15  methamphetamine?  Did Mr. Jones say he used methamphetamine?

16  A    No.

17  Q    Okay.  Tell me exactly what the conversation was after the

18  point that G was mentioned?

19  A    When he mentioned it they said they observed Mr. Jones get

20  a digital scale out, put it on his table and pour what they

21  believed was methamphetamines onto the scale and measured out

22  2.2 grams.

23  Q    All right.

24  A    And then the undercover officers asked Mr. Jones if he was

25  willing to go point for point.

1    Q    What does that mean?

2    A    It's like a term to describe like one -- I don't know how

3    to -- I mean, it's like one gram for $100.

4    Q    Okay.

5    A    And Mr. Jones was -- told the undercover officer that "I

6    usually don't do that unless you buy more than a teener."

7    Q    And what is a "teener?"

8    A    A teener is one-sixteenth of a gram.

9    Q    Okay.

10   A    I'm sorry, one-sixteenth of an ounce.

11   Q    All right.  What happened then?

12   A    So after the hand guns -- both hand guns were purchased,

13   that's when he sold the 2.2 grams for $155.

14   Q    Okay.  So they actually got a better deal than the point

15   -- what you were suggesting a point for point, they actually

16   got a better deal then --

17   A    Yes.  Yes.  Yes.

18   Q    Was there -- was any methamphetamine left after that

19   purchase?

20   A    I believe the baggy that he was pouring out of still had

21   some and the undercover officer stated that -- when we talked

22   to him that he did make reference to having two 8-balls.

23   Q    Okay.  Now when you were -- when was Mr. Jones arrested?

24   A    He was arrested on the -- I'm sorry, I need a calendar.

25   Q    All right.  Well, okay, when he was arrested did you have

1  an opportunity to search Mr. Jones and his -- the garage?

2  A    Yes, we did.

3  Q    Did you find -- how much money was found in the garage or

4  on Mr. Jones?

5  A    I believe it was like $267.  I don't have the exact

6  amount, but it was over $200.

7  Q    All right.  Okay.  But under 300?

8  A    Yes.

9  Q    Was any drugs found in the garage or on Mr. Jones at the

10 time that you had a chance to search him?

11 A    There was a lot of paraphernalia.

12 Q    Right.  Once again I asked if there were any drugs found?

13 A    There was residue inside the paraphernalias.

14 Q    Okay.  What do you mean by "paraphernalia?"

15 A    Smoking pipes, the glass smoking pipes, yes.

16 Q    How many pipes were found?

17 A    I believe I saw three of them.

18 Q    All right.  So -- but pipes would be what someone would

19 use for personal ingestation, I mean, that's how you -- some

20 people smoke?

21 A    That's how -- yes, some people do smoke it.

22 Q    Right.  So the paraphernalia was found with the addition

23 of Mr. Jones's drug use, not of selling drugs?

24 A    Well, it just suggests uses.

25 Q    Okay.  Was there paraphernalia that suggested selling?

1  Did you find drug logs?

2  A    We found a ledger we hadn't gone through yet, but we found

3  -- it had number amounts and stuff like that on it.

4  Q    Did you find a large amount of cash?

5  A    No.

6  Q    Did you find a large amount of drugs?

7  A    Not -- no.

8            **MR. BUTLER:**  One moment, please, your Honor.

9            **THE COURT:**  All right.

10       **(Pause)**

11           **MR. BUTLER:**  Thank you, nothing further.

12           **THE COURT:**  All right, thank you.  Any Redirect?

13           **MS. RAMIREZ:**  No, sir.

14           **THE COURT:**  All right.  Officer, you may step down.

15       **(Witness excused)**

16           **THE WITNESS:**  Thank you.

17           **THE COURT:**  Do you want to be heard, Mr. Butcher?

18           **MR. BUTLER:**  Not unless you have Probable Cause, your

19  Honor.

20           **THE COURT:**  All right.  Based on the testimony of the

21  agent I'm going to find Probable Cause.

22           On the issue of Detention, I will take judicial

23  notice of the information contained in the report from Pretrial

24  Services, as well as the recommendation of Pretrial Services.

25  Does Pretrial Services or does the Government want to add

1  anything to your report?

2          **PRETRIAL SERVICES OFFICER:**  No, your Honor.

3          **MS. RAMIREZ:**  I would reserve the right after

4  Mr. Butcher gives his argument.

5          **THE COURT:**  All right.  Mr. Butcher, do you want to

6  be heard on the issue of Detention?

7          **MR. BUTLER:**  Yes, your Honor.  I had a conversation

8  with the Pretrial Services Officers this morning about the

9  recommendation which I was a little disappointed in.

10          It seemed to me that Mr. Jones would be a good

11  candidate for the La Pasada Halfway House.  In reading the

12  report there was some concern, or what I have is two concerns.

13          The first concern was that they could not confirm the

14  information from his mother.  Apparently they got a hold of

15  her, but there was some kind of communication problem and the

16  mother was not able to confirm any of the information before

17  the conversation was ended.

18          Placing in him La Pasada -- the other problem, I

19  think that troubled Pretrial was the fact that he had an

20  outstanding warrant for, I think, nonpayment of a driving while

21  suspended and alcohol open container issue from 1999 -- I'm

22  sorry, 2009.

23          I would note that except for the driving while

24  suspended, all of his Criminal History is rather dated and

25  dates back to before 2000, usually I think it was all from '97

1    to '99.

2         I would note that even if the allegations are true in

3    this case, that the amount of methamphetamine allegedly

4    involved is like an Offense Level 12 in this case.

5         Like I said, your Honor, I understand since that

6    information about his mother was not confirmed not sending him

7    back out to live where this allegedly happened, but it seemed

8    to me that it was -- that he -- there's not a presumption in

9    this case that I'm aware of because of the small amount, it

10   would be a C level amount.  The Guidelines in this case are not

11   hugely significant.

12        The -- it seems to me that the appropriate placement

13   would be at the La Pasada Halfway House where the Court could

14   make sure he has a job, make sure he gets whatever treatment he

15   may need while he resolves this matter.

16        **THE COURT:**  What are we going to do about the

17   outstanding warrant?

18        **MR. BUTLER:**  Well, I'm assuming once he's released

19   that he would be directed to take care of that.  Once, again,

20   your Honor, it's not a warrant on DUI, it's for, you know,

21   driving while suspended and possession of a open container.  I

22   imagine that matter could be resolved.

23        **THE COURT:**  Okay.  Ms. Ramirez?

24   //

25   //

1       **MS. RAMIREZ:**  Your Honor, it's the Government's

2   position that this is a case that invokes the presumption.  The

3   maximum penalty in the case, irrespective of the Guideline

4   range, is 20 years, which then invokes the presumption that the

5   onus is then on the defendant to show that there are sufficient

6   grounds to rebut that presumption and we don't believe that he

7   has done so.

8       That and coupled with the fact that he does have an

9   outstanding warrant; he doesn't have verifiable income or ties

10  to -- I'm sorry, he does not have verifiable income.  I believe

11  that his mother has since been asked to vacate her residence,

12  so that residence will not be available, and he does seem to

13  have some kind of drug issue or at least some dependence issue.

14  He's had a DWI, he's had a minor possession, he's had a

15  possession of marijuana, and open container arrests so I do --

16  I don't believe that he has rebutted the presumption

17  sufficiently.

18      **THE COURT:**  All right.

19      **MR. BUTLER:**  And we may have rebuttals, your Honor.

20  Two matters -- I may be incorrect, the Government may be

21  correct that presumption applies, but the Government is

22  incorrect if it does imply to what my burden is.

23      My only job is to -- of the sole evidence to show

24  that there are conditions that could support release.  It's the

25  Government's burden of persuasion to persuade the Court

1   Mr. Jones should not be released.

2          In this particular case I think what has been pointed

3   to by the Government are things that would affect if we were

4   asking that he go back to the Reservation to live with his

5   mother.  The fact that the mother may or may not be evicted

6   from the house, even if it's true, would not affect placement

7   in La Pasada Halfway House.

8          Likewise, the fact that he may have some issues with

9   alcohol over the years, once again, the last one being some

10  time ago, those issues would certainly be addressed by La

11  Pasada Halfway House.

12         We're not asking that he is to be turned loose on the

13  street and go back to the situation that led to these charges,

14  but we're asking that he go to a very structured environment by

15  the La Pasada Halfway House where he would be on a very short

16  leash, that he could get the treatment that he needs and that

17  the Court should be assuaged that he's not a flight risk or a

18  danger to the community.  I don't think there's any real

19  showing that he's a flight risk in the sense that he's going to

20  leave the New Mexico area or has a place to go.  It seems to me

21  that where he needs to be is in a very structured environment.

22         **THE COURT:**  All right, thank you.

23         I would note that the information regarding some of

24  his criminal history involves events that occurred 15 years

25  ago.  The only recent event is this 2009 arrest for an open

1 container and driving with a suspended license, and that's the

2 one for which there's an outstanding warrant, so I think

3 conditions can be fashioned that would satisfy my concerns that

4 Mr. Jones is a danger to the community. So I'm going to remand

5 him to the third party custody of La Pasada Halfway House with

6 the usual terms and conditions including that he get counseling

7 treatment subject to random drug testing for the presence of

8 alcohol and drugs. He'll be allowed to work if he can find

9 employment through the efforts of the folks at La Pasada.

10 Mr. Jones, will you come up to the podium with your

11 attorney, please?

12 Also he's going to have to resolve this outstanding

13 warrant.

14 I'm going to release you to La Pasada Halfway House

15 here in Albuquerque, Mr. Jones. You need to comply with all of

16 their rules and regulations. They're very strict rules and

17 regulations. You can't have in your possession or use any

18 alcohol, any controlled substance or narcotic drug. You will

19 be subjected to random testing for the presence of these

20 substances in your system, and if they're found a warrant will

21 be issued for your arrest. You would be back in front of me

22 and you will go to jail and stay in jail, do you understand

23 that?

24 **THE DEFENDANT:** Yes, sir.

25 **THE COURT:** You will be allowed to work. You'll have

1    to, if you find a job, and La Pasada assists people in finding

2    jobs with some local employers, you'll have to take public

3    transportation to work, report when you get to work.  You'll

4    have to take public transportation or walk, come back directly

5    to La Pasada after work, and if there's any issues with that,

6    again, a warrant could be issued for your arrest.

7             Also, you need to understand that you can't have any

8    contact with any potential witnesses regarding these charges

9    against you including and especially your cousin, and you can't

10   attempt to interfere in any way with the investigation that's

11   being conducted regarding these charges against you.

12            If you do any of those things you could be facing

13   additional charges, and those charges could result in time in

14   prison and a significant fine.

15            Also you need to make sure that you show up for all

16   future proceedings in our Court.  If you fail to show up for a

17   future proceeding in our Court a warrant will be issued for

18   your arrest and you would be charged with additional charges.

19   Those charges could involve spending time in prison and a

20   significant fine.

21            And, finally, needless to say, you should not commit

22   a crime while you're on third party custody release which is

23   the La Pasada Halfway House because not only would you be

24   facing charges for whatever that crime might be, but that could

25   have a significant impact on what might happen to you with

respect to these charges.

Do you understand all of these things?

**THE DEFENDANT:** Yes, sir.

**THE COURT:** All right. And then you need to work with Mr. Butcher or perhaps members of your family to get this arrest warrant from Farmington satisfied, it may be as simple as paying a fine, but that needs to be taken care of, do you understand?

**THE DEFENDANT:** Yes, sir.

**THE COURT:** Anything else from Pretrial?

**PRETRIAL SERVICES OFFICER:** Your Honor, there is a waiting list at the Halfway House that he will be placed on.

**THE COURT:** All right. We'll put you on the waiting list, but in the meantime if you can do something to -- or maybe Mr. Butcher can help you get that arrest warrant resolved, that would be good.

**MR. BUTLER:** I'll try contacting his mother, your Honor.

**THE COURT:** All right. Anything else, Ms. Ramirez?

**MS. RAMIREZ:** No, sir.

**THE COURT:** All right. Counsel may be excused. You go this way, Mr. Jones.

**(This proceeding was adjourned at 10:20 a.m.)**

CERTIFICATION


I certify that the foregoing is a correct transcript from the
electronic sound recording of the proceedings in the above-
entitled matter.




_____          _May 9, 2014  _


                    TONI HUDSON, TRANSCRIBER